COUCH *v.* STOUT.

4-4707

Opinion delivered June 28, 1937.

*Cockrill, Armistead & Rector,* for appellant.
*John Sherrill* and *Howard Cockrill,* for appellee.

SMITH, J. For accommodation appellant Couch indorsed W. C. Ribenack's $25,000 promissory note, dated February 7, 1931, bearing 4 per cent. interest, and payable three years after date, to appellee, William W. Stout's order. Ribenack had been employed by and had been president of the Stout Lumber Company. Ribenack was indebted to the lumber company, or to Mrs. Stout, the principal stockholder of the lumber company, as far back as the record before us extends, and was indebted to Mrs. Stout in 1928 in the sum of $82,460.79, and as secur-

ity therefor he deposited with Mrs. Stout 11,978 shares of stock in the lumber company as collateral. At the same time Ribenack was indebted to W. W. Stout, the son of Mrs. Stout, who later succeeded Ribenack as president of the lumber company, in the sum of $100,000, which indebtedness was secured by the same collateral. From and after 1928, Ribenack borrowed large sums of money from the lumber company, for which he, also, pledged the 11,978 shares of stock owned by him, subject, however, to the prior liens of Mrs. Stout and of W. W. Stout. Certain other stocks were also, pledged as collateral. By October 30, 1929, Ribenack was indebted to the lumber company in the sum of $515,000. This was in addition to the indebtedness due Mrs. Stout and W. W. Stout. By the beginning of 1931, Ribenack was in need of additional cash, and made application to W. W. Stout for an additional loan of $200,000, which Stout was unwilling to make on the collateral then held, but on February 7, 1931, a written contract was entered into between Ribenack, designated therein as party of the first part, and Stout, designated as party of the second part, in regard to additional advances made and to be made, from which we copy so much as is important in the decision of this appeal.

This contract recites that "First party desires to borrow from time to time sums of money aggregating two hundred thousand dollars ($200,000) from second party, or such part or so much thereof as second party may in his judgment from time to time elect to loan to first party; and

"Whereas, second party is willing at this time to make an initial loan to first party of fifty thousand dollars ($50,000), and may hereafter if he so elects in his uncontrolled discretion make further loans to first party upon certain terms and conditions,

"Now, therefore, it is agreed as follows:

"Said first party agrees:

"1.  To forthwith make and deliver to second party his collateral note of even date herewith in the sum of fifty thousand dollars ($50,000), said note to be payable

to the order of second party, with due date and interest as set forth therein, said note being given to represent the loan of fifty thousand dollars ($50,000) made by second party concurrently with the delivery of said note, the receipt of which first party hereby acknowledges.''

The second paragraph of the contract provided for an additional loan of $100,000, to be evidenced by four separate notes, each for the sum of $25,000, to be indorsed by a designated indorser. One of these was a note to be indorsed by appellant Couch. All four notes which were numbered 1, 2, 3 and 4, were dated February 7, 1931, were due in three years, and bore interest at 4 per cent. per annum, payable semi-annually.

The loan agreement further provides that:

''If further loans are made to first party by second party, entirely at the election of second party, it is agreed that said loans be applied towards the sums called for in said notes one (1), two (2), three (3), and four (4), and appropriate indorsement will be made to represent unearned interest from the date of said notes to the date of the advancement of the funds by second party. It is further understood that if second party at his election should advance the full further sum of one hundred thousand dollars ($100,000), representing the face value of said four notes, and thereafter elect to advance further sums, that said further loans shall be evidenced by notes payable to the order of second party, made and delivered by first party, and corresponding in form, interest rate, and due dates to the note evidencing the initial loan this day made by second party to first party.

''3. First party further agrees that all sums loaned to him by second party may at the election of second party be placed in a special account, standing in the name of second party and/or his nominee, in a bank selected by second party and applied by second party and F. W. Niemeyer in discharging such proper obligations of first party as the second party and/or second party and said F. W. Niemeyer deem advisable; and in the event any of said obligations of first party so paid are secured by collateral of said first party, second party and/or second

party and F. W. Niemeyer are hereby authorized to receipt for said collateral so released on the payment of said obligation in the name of first party and for his account, and to retain said collateral to secure the obligations of first party to second party whether then in existence or thereafter to accrue."

First party agreed to assign to second party life insurance policies aggregating $378,500, against which there were policy loans in the sum of $41,271.50, and the right was given second party to pay future premiums, which, if paid, were to be considered as additional loans made under the contract. Second party did not agree to pay future premiums.

The loan agreement further provides:

"Second party agrees as follows: 1. To give appropriate credits by indorsements at the time further loans, if any, are made of unearned interest on the four notes aggregating one hundred thousand dollars ($100,-000), to be delivered to him pursuant to terms of paragraph two of this agreement.

"2. To make such further loans from time to time pursuant to terms of this agreement as in his uncontrolled discretion he may care to make.

"3. To return all excess collateral held to first party or his order, immediately upon the payment of the last outstanding obligations of first party arising because of this agreement and/or any notes or other obligations undertaken by first party pursuant to the terms hereof."

It thus appears that on February 7, 1931, a loan of $50,000 was made by Stout to Ribenack, with an agreement to loan $100,000 additional upon the security of the four notes above referred to. The required indorsements of these notes were obtained and the additional loans were made. Only one of these notes is involved in this litigation, presumably the others were paid. The note indorsed by Couch was an ordinary note, which made no reference to the loan agreement above referred to.

The note evidencing the $50,000 loan to Ribenack, made February 7, 1931, recites that: "To secure the

payment of this note and all other liabilities of the undersigned (Ribenack) to the holder hereof, howsoever created, arising or evidenced, or acquired by said holder, whether now or hereafter existing, and whether accrued or to become accrued, the undersigned has pledged, transferred and delivered to said W. W. Stout the following property, viz:''. There follows a long list of stocks and property, including the 11,978 shares of Stout Lumber Company stock. The notes authorized a sale of the collateral either publicly or privately upon default made in payment.

The $25,000 note indorsed by Couch was not paid at maturity, and payment having been refused upon demand this suit was brought to enforce payment. The cause was transferred on motion of Couch to the chancery court, and from a decree awarding judgment for the face of the note and the interest thereon is this appeal.

Couch testified at the trial from which this appeal comes that he was induced to indorse the note by the representation then made to him by Ribenack that the note was abundantly and sufficiently secured by collateral held by Stout; but he admitted that he never discussed the matter with Stout and that Stout made no representations of any character, and in a letter to Stout admits his negligence in this respect. Couch knew that Stout was unwilling to make the loan on the collateral then held and was demanding indorsements as a condition upon which the $100,000 loan would be made. Couch indorsed the note to meet this condition, relying solely on Ribenack's representation to him that Stout held sufficient collateral belonging to Ribenack to fully secure Ribenack's entire indebtedness.

The date of Couch's indorsement is undetermined, but that it was not contemporaneous with the execution of the loan agreement above set out is certain. Couch first declined to indorse the note notwithstanding Ribenack's representation in regard to the sufficiency of the collateral, and only agreed to do so upon the condition that C. S. McCain, then residing in New York, would also indorse one of the $25,000 notes above referred to.

Ribenack stated to Couch that he would secure that indorsement as soon as he could go to New York and see McCain. In about a month, or possibly later, Ribenack exhibited to Couch a note indorsed by McCain, whereupon Couch indorsed the note here in suit.

There is but little conflict in the testimony, and no questions of veracity are involved. The transactions between Ribenack and Mr. and Mrs. Stout and with the Stout Lumber Company are set out in detail and cover many pages of the record, and this opinion would be extended to an indefinite length if they were recited. We find it only necessary to summarize them.

At the time of the loan agreement executed on February 7, 1931, the first lien on Ribenack's stock in the lumber company held by Mrs. Stout had not been discharged, and the second lien by Stout for $100,000 had not been paid, and there was an indebtedness due the lumber company of $515,000, for the payment of all of which Ribenack's stocks had been pledged. In December, 1931, the lumber company took over the prior indebtedness due Mrs. Stout, and also that due Mr. Stout, so that the lumber company held more than $615,000 of Ribenack's paper. This, Ribenack was unable to pay, so an agreement was reached whereby the collateral belonging to Ribenack was transferred to the lumber company at an agreed valuation of $423,287.

It is upon this sale at this price that Couch predicates his defense to the suit on the note which he indorsed. The argument is that the $50,000 note of February 7, 1931, which no one indorsed, contained the recital that the collateral was pledged "To secure the payment of this note and of any and all other liabilities of the undersigned to the holder hereof, howsoever created, arising or evidenced, or acquired by said holder, whether now or hereafter existing, and whether accrued or to become accrued, * * * and further to secure said note and liabilities the undersigned hereby pledges, assigns and transfers any and all other property of every kind and description now or hereafter and howsoever in the possession or control of the holder hereof; * * *."

Authority was given to sell the collateral either publicly or privately, and it was then provided that "after deducting all costs and expenses incurred at any time in the collection, protection, sale and delivery of said property and the liabilities secured thereby to the payment of this note and/or any or all of said liabilities, whether accrued or not, returning the residue to the undersigned on demand."

It is argued that under this agreement the collateral was pledged for the security of the entire indebtedness due by Ribenack and should have been applied ratably to its discharge; and, that if this is not so, that Stout should be held to account for the actual market value of the collateral, which had a face value greater than the entire indebtedness, and that the excess should be applied *pro tanto* to the credit of the note here sued on.

Disposing of the last stated contention first, it may be said that the testimony does not show that the collateral was sold and assigned by Ribenack for less than its actual value. Stout was examined at length upon this question, and there was no testimony contradicting his estimates of its value, which had been arrived at by an agreement between Stout and Ribenack fixing the value. They probably knew as much or more about these values than any one else. Ribenack was not called as a witness, and, according to the testimony offered, the collaterals were credited at their full value. When the credit had been applied there remained a balance due the lumber company of more than $237,000, and there was, therefore, no surplus to go to Stout for credit upon any other indebtedness.

There was no misapplication of this credit. The testimony touching these collaterals shows that they were under a prior pledge, first to Mrs. Stout, and second to Stout for $100,000, and third to the Stout Lumber Company for $515,000, then to Stout for $50,000, and then for the last loan of $100,000, of which the note here in suit was a part. As much as can be said of the recitals quoted from the $50,000 note and the loan agreement as to the disposition of the collateral there referred to is that the

four notes of $25,000 each should prorate with the $50,-000 in the credit of the excess value of the collateral after the prior indebtedness which the same collateral secured had been paid; but there was no excess. We do not find it necessary to decide, however, whether these agreements entitled the four $25,000 notes to prorate with the $50,000 note, all bearing date February 7, 1931.

The record before us does not disclose any misrepresentation made to Couch by Stout. Stout made no representation of any character. It is no doubt true that Couch indorsed the note under a misapprehension of the facts, but Stout is not responsible for the misapprehension. Couch thought he was becoming a mere surety upon a note otherwise amply secured, but Stout had neither occasion nor opportunity to correct the misapprehension. "However, unless asked in regard to a matter, it is not the duty of the creditor or obligee voluntarily to seek the surety, and to disclose facts which are open equally to the knowledge of each party. It is the duty of the surety to protect himself, and to ascertain the risk he is incurring, and he cannot, by his neglect, throw the burden on the creditor or obligee to inform him as to matters which he could ascertain for himself without difficulty. Were the creditor required to dwell upon the risk the surety is running by entering into such a contract, it would be well nigh impossible to find anyone willing to become a surety." Child's Suretyship and Guaranty, § 54, page 65. Had Stout either misrepresented or concealed any relevant fact we would have a question not presented by this record.

This view of the testimony makes it unimportant to consider any of the other questions discussed in the briefs.

The decree is correct and is, therefore, affirmed.